Lester BERGNER, Appellant-Defendant,

v.

STATE of Indiana, Appellee-Plaintiff.

No. 3–379A85.

Court of Appeals of Indiana,
Fourth District.

Dec. 12, 1979.

Rehearing Denied Feb. 19, 1980.

Paul J. Giorgi, P. C., Merrillville, for appellant-defendant.

Theo. L. Sendak, Atty. Gen., Rollin E. Thompson, Asst. Atty. Gen., Indianapolis, for appellee-plaintiff.

CHIPMAN, Judge.

Following a jury trial in the Lake Superior Court appellant Lester Bergner was convicted of sodomizing[1] his four-year old daughter. His appeal challenges the trial court's rulings on the admissibility of photographs depicting the act of fellatio and the applicability of the marital privilege to the testimony of his ex-wife. Appellant also argues the evidence was insufficient to support the verdict. We have extensively reviewed and researched these issues and affirm appellant's conviction.

## FACTS

The principal evidence in this case consisted of State's Exhibits 1 and 2 which are photographs depicting the act of fellatio by a female child on an adult male. The photographs show the child lying between the man's legs with her face, head, and upper body clearly visible. Only the lower body of the male—from the chest to the knee—can be seen, however. The man is partially clothed in a bathrobe.

In May, 1977 appellant's ex-wife, X, went to appellant's home to look for these photographs after having been told of their existence by appellant's son, W. Although appellant was not home at the time, X apparently searched the darkroom located in the home and discovered the photographs in a box on a shelf. The photographs were later turned over to Detective Mitchell of the Highland Police Department.

At trial X identified her four-year old daughter, Y, and appellant as the persons depicted in the photographs. Her identification of appellant was based upon her recognition of appellant's lower body, a hernia scar on his abdomen, and his bathrobe. She

---

1. Ind.Code 35–1–89–1 (since repealed). Appellant was also charged with the crime of Assault and Battery with Intent to Gratify, Ind.Code 35–1–54–4 (since repealed). This second Count was dropped pursuant to Appellant's Motion for Directed Verdict.

also was able to recognize a portion of the living room of the home they shared during their marriage. She established October 1976 as the approximate date the photographs were taken; Y's teenage brother had attempted to cut her hair shortly before and a distinctly unprofessional haircut resulted.

Detective Mitchell verified having received the photographs from X. He subsequently arrested appellant, and during booking procedures requested appellant lower his trousers far enough to reveal the hernia scar. Mitchell stated the scar he observed was "consistent with" the one depicted in the photographs.

Barry Mones was qualified as an expert photograph examiner for the F.B.I. His analysis of the photographs revealed they were "authentic and . . . not composites or altered." He also testified the photographs and their respective negatives were taken on Polaroid black and white film.

The only witness called by the defense was Carol Bergner, appellant's current wife. She noted a number of physical discrepancies between appellant and the male in the photographs and stated, in her opinion, the photographs were not of her husband.

At the close of the testimony the State moved to have appellant examined by a doctor, presumably to secure impartial identification evidence. The trial court denied this motion but suggested an even more novel procedure: the court ordered appellant to lower his pants and display his lower abdomen and thighs to the jury. Neither prosecution nor defense objected to this procedure which the trial judge characterized as "a rather unusual thing for the court to do." The jury convicted appellant of the crime of sodomy and this appeal followed.

### ISSUES

I. Were two photographs erroneously admitted on improper foundation evidence where no witness testified the photographs were true and accurate representations of what they purported to depict?

II. Did the trial court err in permitting appellant's ex-wife to testify in violation of the marital privilege?

III. Was the evidence sufficient to support the verdict?

### I. PHOTOGRAPHIC EVIDENCE

Whether the two photographs depicting the sexual act were properly admitted into evidence presents a novel question and a case of first impression for Indiana courts. Appellant argues the photographs were inadmissible because the State failed to establish the proper foundation for their admission as required by existing Indiana law. This assertion is patently correct, but the State contends the photographs were admissible under the so-called "silent witness theory" of photographic evidence and urges us to adopt this theory.

#### A. CURRENT INDIANA LAW

Indiana courts traditionally have stressed three requirements for the admission of photographic evidence. First, an adequate foundation must be laid. Our courts have consistently held this requires the testimony of a witness who can state the photograph is "a true and accurate representation of the things it is intended to depict." *Wilson v. State*, (1978) Ind., 374 N.E.2d 45; *Boone v. State*, (1978) Ind., 371 N.E.2d 708; *Green v. State*, (1976) 265 Ind. 16, 349 N.E.2d 147; *Murry v. State*, (1979) Ind.App., 385 N.E.2d 469. *See McCurdy v. State*, (1975) 263 Ind. 66, 324 N.E.2d 489 (photos properly excluded for failure to satisfy this requirement); *Johnson v. State*, (1972) 258 Ind. 648, 283 N.E.2d 532 (same).

Relevancy is the second requirement for the admission of photographic evidence in Indiana. Like all evidence, a photograph must meet the usual relevancy standard, i. e., it must tend to prove or disprove a material fact. *Smith v. Crouse-Hinds Company*, (1978) Ind.App., 373 N.E.2d 923. In applying this standard to photographic evidence, our courts ask whether a witness would be permitted to testify as to the subject matter portrayed in the photograph. *Simpson v. State*, (1978) Ind., 381 N.E.2d 1229; *Crane v. State*, (1978) Ind., 380

N.E.2d 89. If so, the photograph is deemed relevant.

Finally, some Indiana cases require the photographs aid jurors' understanding of other evidence. *See Whitfield v. State,* (1977) 266 Ind. 629, 366 N.E.2d 173; *Patterson v. State,* (1975) 263 Ind. 55, 324 N.E.2d 482; *McPherson v. State,* (1978) Ind.App., 383 N.E.2d 403. Whether this is truly a requirement for the admission of photographs in Indiana is not totally clear. Some cases seem to elevate it to the level of a requirement, *McPherson, supra,* while others merely recite it as a part of the relevancy test, *Whitfield, supra.*

B. *THE SILENT WITNESS THEORY*

Although all three requirements for the admission of photographic evidence are important, in this case we are singularly concerned with the foundation requirement. Indiana's approach to the admission of photographs, as guided by the current foundation requirement, falls within what has been characterized as the "pictorial testimony theory" of photographic evidence. III J. Wigmore, Evidence § 790 (Chadbourn rev. 1970). This theory categorizes photographs with maps, models and diagrams, and thus treats photographs purely as demonstrative evidence. As such, a photograph is not evidence in itself, but is used merely as a nonverbal method of expressing a witness' testimony and is admissible only when a witness can testify it is a true and accurate representation of a scene personally viewed by that witness. McCormick, Evidence § 214 (1972); 2 C. Scott, Photographic Evidence § 1001 (1969).

The "silent witness theory" for the admission of photographic evidence permits the use of photographs at trial as *substantive* evidence, as opposed to merely demonstrative evidence. Thus, under the silent witness theory there is no need for a witness to testify a photograph accurately represents what he or she observed; the photograph "speaks for itself." III J. Wigmore, Evidence § 790 (Chadbourn rev. 1970). The theory may be best explained by examining some of the contexts in which it is commonly applied.

One of the most frequent, and often unintentional, utilizations of the silent witness theory occurs when X-rays are admitted into evidence. Obviously, no witness can testify he or she saw what an X-ray depicts, thus rendering the pictorial testimony theory logically inapplicable.[2] 3 C. Scott, Photographic Evidence § 1262 (1969). Nevertheless, every jurisdiction admits X-ray photographs as substantive evidence upon a sufficient showing of authentication. This usually entails the establishment of the reliability and trustworthiness of the X-ray machine, the operator or technician, the procedure used in exposing and processing the X-ray plate, and record keeping techniques so as to establish the identity and condition of the patient. *See, e. g., Slow Development Company v. Coulter,* (1960) 88 Ariz. 122, 353 P.2d 890; *Sinz v. Owens,* (1949) 33 Cal.2d 749, 205 P.2d 3; Field, *Uses and Limitations of X-ray Pictures as Evidence,* 2 Forum 219 (1967).

A context in which the silent witness theory has been expressly employed involves cases in which Regiscope photographs are introduced into evidence. A Regiscope is simply an automatic camera which takes a simultaneous picture of a check being offered for cashing and of the person presenting it. Regiscope photographs are often admitted as substantive evidence in forgery prosecutions despite the inability of the clerk who cashed the check to remember the particular transaction or individual. Typically, the courts require a showing of authenticity which includes an identification of the defendant as the individual depicted and a showing of the proper functioning of the camera and processing of

---

2. Some jurisdictions freely admit X-rays upon a proper showing of verification without recognizing the silent witness theory. Generally these jurisdictions treat X-rays as scientific, as opposed to photographic, evidence. Indiana is a prime example. *See Howard v. State,* (1976) 264 Ind. 275, 342 N.E.2d 604. Although Wigmore treats the admission of X-ray evidence much the same as Indiana, he admits the silent witness theory may be a "more satisfactory rationale." III Wigmore, Evidence § 795 n. 1 (Chadbourn rev. 1970).

the photograph. *United States v. Gray*, (1976 8th Cir.) 531 F.2d 933; *Barker v. People*, (1965) 158 Colo. 381, 407 P.2d 34; *Sisk v. State*, (1964) 236 Md. 589, 204 A.2d 684 (expressly adopting silent witness theory for first time); *State v. Tatum*, (1961) 58 Wash.2d 73, 360 P.2d 754.

The silent witness theory has also been adopted in cases involving bank robbery photographs. These are photographs taken during the course of a robbery by automatic or hidden cameras and are admitted as substantive evidence upon a sufficient showing of the reliability of the procedures used in taking and developing the photographs. *E. g., United States v. Taylor*, (1976 5th Cir.), 530 F.2d 639 (photographs taken after defendant locked all bank personnel in safe held admissible as substantive evidence). *See Murry v. State*, (1979) Ind.App., 385 N.E.2d 469, in which Judge Shields stated a photograph taken during a robbery could have been properly admitted had there been testimony indicating when the film was installed, when the pictures were taken, or whether the camera was activated at any other times.

We have presented the above cases and their foundation requirements because we think it important to note how these various courts have stressed the need for authentication or verification of the photographs. We think it equally important to note the courts have recognized that the verification requirement should be understood in a *relative* sense. *See generally* Annot. 9 A.L.R.2d 899 (1950). In other words, these courts have not blindly followed the formal, traditional requirement of admitting photographs solely as demonstrative evidence. Instead, these jurisdictions have analyzed the theory behind the traditional requirements, and have recognized the probative potential of photographic evidence. As a result, these courts view photographic evidence in a modern, realistic light and admit photographs where their authenticity can be sufficiently estab-

lished in view of the context in which the photographs are sought to be admitted. We think this creative analysis and refusal to follow traditional standards merely because such standards exist is laudable as the highest form of a progressive judiciary.

■ Our consideration of the authorities and the arguments in both the State's and the appellant's excellent briefs leads us to an inescapable conclusion. We hereby accept the State's invitation and adopt the silent witness theory for the admission of photographic evidence as the law in Indiana.

In so doing, we cannot help but note the good company in which we find ourselves. The following jurisdictions, when presented with the issue we now decide, have also adopted the silent witness theory: *United States v. Gray*, (1976 8th Cir.) 531 F.2d 933; *United States v. Taylor*, (1976 5th Cir.) 530 F.2d 639; *Watkins v. Reinhart*, (1942) 243 Ala. 243, 9 So.2d 113; *State v. Kasold*, (1974) 110 Ariz. 558, 521 P.2d 990; *People v. Bowley*, (1963) 59 Cal.2d 855, 31 Cal.Rptr. 471, 382 P.2d 591; *People v. Doggett*, (1948) 83 Cal.App.2d 405, 188 P.2d 792; *Oja v. State*, (1974) Fla.App., 292 So.2d 71; *Franklin v. State*, (1882) 69 Ga. 36; *Cook v. Clark*, (1971) Iowa, 186 N.W.2d 645; *State v. Young*, (1973) Me., 303 A.2d 113; *Sisk v. State*, (1964) 236 Md. 589, 204 A.2d 684; *Hartley v. A.I. Rodd Lumber Co.*, (1937) 282 Mich. 652, 276 N.W.2d 712; *People v. Withers*, (1961) Mo., 347 S.W.2d 146; *King v. State*, (1922) 108 Neb. 428, 187 N.W. 934; *People v. Byrnes*, (1974) 33 N.Y.2d 343, 352 N.Y.S.2d 913, 308 N.E.2d 435; *State v. Hunt*, (1979) 297 N.C. 447, 255 S.E.2d 182;[3] *State v. Brown*, (1970) 4 Or.App. 219, 475 P.2d 973; *State v. Goyet*, (1957) 120 Vt. 12, 132 A.2d 623; *Ferguson v. Commonwealth*, (1972) 212 Va. 745, 187 S.E.2d 189, *cert. denied* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108. *But see Casson v. Nash*, (1977) 54 Ill.App.3d 783, 12 Ill.Dec. 760, 370 N.E.2d 564, 573 n. 3; *Foster v. Bilbruck*, (1959) 20 Ill.App.2d 173, 155 N.E.2d 366, 372.

---

**3.** This recent North Carolina opinion is especially significant. North Carolina was one of the jurisdictions most reluctant to adopt the silent witness theory. *See The Camera Goes to Court*, 24 N.C.L.Rev. 233 (1946).

We recognize our adoption of the silent witness theory permits the admission of photographs as substantive or demonstrative evidence. We stress we are not changing existing Indiana law; we are adding a second basis for the admissibility of photographic evidence. Thus, our holding in no way affects the use of photographs as demonstrative evidence; the traditional requirements for admissibility as laid down in numerous Indiana cases remain wholly effective.

Likewise, the relevancy requirement must be met when photographs are admitted as substantive evidence. The requirement that a photograph aid the jury in understanding other evidence remains effective, if at all, only when photographs are used for demonstrative purposes. By its nature, this requirement relates only to demonstrative evidence and has no logical applicability when photographs are used substantively.

█ The foundation requirements for the admission of photographs as substantive evidence under the silent witness theory are obviously vastly different from the foundation required for demonstrative evidence. However, we feel it would be wrong to lay down extensive, absolute foundation requirements. Every photograph, the context in which it was taken, and its use at trial will be different in some respect. We therefore hold only that a *strong* showing of the photograph's competency and authenticity must be established. Whether a sufficiently strong foundation has been laid is left to the sound discretion of the trial court, reviewable only for abuse. However, we stress our use of the adjective "strong." Photographs tend to have great probative weight and should not be admitted unless the trial court is convinced of their competency and authenticity to a *relative certainty*.

█ Despite our reluctance to formulate absolute standards for the admissibility of photographs as substantive evidence, we feel compelled to require proof the photograph has not been altered in any significant respect. This is necessary to avoid the dangers of misrepresentation or manufactured evidence which are possible through composite or retouched photographs. Additionally, we suggest a few non-mandatory guidelines for the admission of photographs under the silent witness theory. The date the photograph was taken should be established in certain cases, especially where the statute of limitations or the identity and alibi of the defendant are in question. In cases involving photographs taken by automatic cameras, such as Regiscopes or those found in banks, there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and chain of custody of the film after its removal from the camera. *See Murry v. State*, (1979) Ind.App., 385 N.E.2d 469.

In adopting the silent witness theory we are cognizant of two problems which arise when photographs are used as substantive evidence. The first involves the potential for distortive and misrepresentative images present in any photograph. The second concerns the inability to "cross-examine" a photograph being used as a silent witness.

█ Photography is not an exact science. The image a camera produces on film can be affected by a variety of things that may lead to distortion and misrepresentation. The quality of the camera and lens, type of film, available light, focal length of the lens, use of lens filters, or even the perspective from which the photograph is taken can play a part in producing a truly representative photograph. *See* 1 C. Scott Photographic Evidence, §§ 151–587 (1969). However, assuming any misleading qualities of a photograph are not so egregious as to result in an inadequate foundation, complaints concerning a photograph's distortion go only to the weight to which a photograph is entitled, not admissibility. III Wigmore, Evidence § 792 (Chadbourn rev. 1970); Comment, *Photographic Evidence— Is There a Recognized Basis for Admissibility?* 8 Hast.L.J. 310, 311 (1957). In addition, we note the testimony of an eyewitness is subject to many failings. Essentially, a

witness' testimony is based upon what he thinks he remembers he saw. Although the human eye is capable of perceiving many things and the human brain has an unmatched capacity for the retention of information, neither is infallible. A witness' perception of an event may be distorted by his other senses, optical illusions, hallucinations, or other simple perception errors. He is also likely to have forgotten some of what he saw or may have difficulty communicating his recollection in words. See 1 C. Scott, Photographic Evidence §§ 41–54 (1969). On the other hand, a photograph sees in more detail, remembers more accurately and transmits its message more clearly than any human witness. Id. Thus, although a witness' testimony and a photograph suffer from some of the same maladies, the photograph is far superior in many respects.

The second problem posed by our adoption of the silent witness theory concerns the inability to "cross-examine" the photograph.[4] We first note that before a photograph can be admitted under the silent witness theory a proper foundation must be laid. The opposing party, therefore, is able to extensively cross-examine the witness whose testimony establishes the foundation. Once a foundation is properly established, the photograph gains a certain degree of authenticity and reliability, and we perceive no compelling need for further cross-examination. The situation is analogous to the exceptions to the hearsay rule where the declarant is unavailable. Once "circumstantial guarantees of trustworthiness" are demonstrated an out-of-court assertion is admissible notwithstanding the inability of the opponent of the evidence to cross-examine the declarant. Fed.R.Evid. 804. In light of the ability to cross-examine those witnesses whose testimony establishes the required foundation, and the authenticity and reliability which attaches to a photograph once a sufficient foundation has been laid, we are unwilling to say the inability to "cross-examine" a photograph is a sufficient basis for the exclusion of photographs as substantive evidence.

### C. APPLICATION

 Having adopted the silent witness theory, we must now determine whether the photographs involved in this case were properly admitted. There were three main grounds used by the State to establish the foundation. They clearly demonstrate a sufficient degree of authenticity for the admission of the photographs.

First, there was expert testimony to show the photographs had not been altered in any way. Barry Mones, the photographic examiner for the F.B.I., stated his examination and testing of the photographs revealed they were not retouched nor composites.

Second, the approximate date the photographs were taken was shown to be October, 1976. Appellant's ex-wife, X, testified to this based on her daughter's haircut in the picture. The haircut was memorable because it had been given, ineptly, by X's son. This evidence was corroborated by Barry Mones' testimony regarding the date of manufacture of the film. He stated Exhibit 1 was manufactured in August, 1966 or 1976, and Exhibit 2 was produced in January, 1964 or 1974. He also stated Polaroid film has a relatively short life, thus leaving an inference that the later dates are more likely the actual dates of manufacture.

Finally, there was strong testimony regarding the identification of the two persons in the photographs. X unequivocally identified her daughter, Y, and portions of the living room of the home she shared with appellant during their marriage. She also identified appellant on the basis of a robe she had purchased for him, and her knowledge of the general shape of his lower body and hernia scar. X's recognition of the scar was reinforced by the testimony of Detective Mitchell who stated appellant's scar was "consistent with" the one in the photograph.

---

4. This issue, raised by appellant, appears to present a unique question. Our research has uncovered no other case which has dealt with the "cross-examination" of a photograph.

Our decision to hold the photographs admissible is buttressed by similar decisions from other jurisdictions. In People v. Doggett, (1948) 83 Cal.App.2d 405, 188 P.2d 792, a married couple was charged with sodomy on the basis of a photograph depicting the act. Although there were no eyewitnesses to the sexual activity, a landlord and police officer testified the photograph accurately portrayed the defendant's living room, and an expert witness stated the photograph was not a composite. In affirming the conviction the court held that as long as the photograph could be "verified or authenticated," the manner in which the requisite showing was made was unimportant. To the same effect, see People v. Bowley, (1963) 59 Cal.2d 855, 31 Cal.Rptr. 471, 382 P.2d 591.

Similarly, the New York Court of Appeals held admissible photographs depicting sodomy and intercourse between the defendant and his eleven year old daughter. People v. Byrnes, (1974) 33 N.Y.2d 343, 352 N.Y.S.2d 913, 308 N.E.2d 435. The court based its decision on the identification testimony of the child's mother and an expert opinion that the photographs had not been altered or doctored. "[A] fair conclusion is that the foundation testimony, even excluding that of the complainant, sufficiently authenticated the photographs by showing that they accurately depict what they purport to show, and that in themselves, the photographs were probative evidence of the crimes charged." Id. 352 N.Y.S.2d at 917, 308 N.E.2d at 438. Accord, State v. Kasold, (1974) 110 Ariz. 558, 521 P.2d 990.

Our evaluation of these authorities, analysis of the silent witness theory, and consideration of the facts of this case lead us to but one conclusion. The trial court did not abuse its discretion and thus committed no error in admitting the photographs as substantive evidence.

## II. MARITAL PRIVILEGE

Appellant's second argument concerns the applicability of the marital privilege to the testimony of his ex-wife, X. It is his contention that X's identification of his hernia scar and lower body was based on knowledge gained by virtue of the marital relationship, and therefore, constituted privileged information which should not have been admitted.

Ind.Code 34–1–14–5 states husbands and wives are "incompetent"[5] witnesses "as to communications made to each other." "Communications" are not limited to audible communications but include any knowledge gained by virtue of an act by one spouse which would not have been done in the presence of the other spouse but for the marital relationship. Smith v. State, (1926) 198 Ind. 156, 152 N.E. 803. The privilege is based on strong public policy grounds which "favors the promotion and preservation of marital confidences, even at the expense, in certain instances, of depriving honest causes of upright testimony." Shepherd v. State, (1971) 257 Ind. 229, 277 N.E.2d 165, 167. The policy clearly restricts the privilege to communications made in the course of a legally recognized marriage. Lane v. State, (1977) 266 Ind. 485, 364 N.E.2d 756; Damrell v. State, (1976) Ind. App., 352 N.E.2d 855. However, as long as a communication is made within the course of a marriage, divorce does not subsequently remove the privilege. Shepherd v. State, supra; Perry v. Randall, (1882) 83 Ind. 143.

Based upon this law, appellant argues his ex-wife's knowledge of his lower body and hernia scar "was gained by virtue of the very essence of the conjugal relationship between the spouses, i. e., the intimacy occasioned by acts of sexual intercourse during the marriage."[6] However, even if

---

5. The use of the word "incompetent" is technically incorrect. Our case law makes clear that the statute creates a privilege as to confidential communications, not an absolute incompetency. Shepherd v. State, (1971) 257 Ind. 229, 277 N.E.2d 165; Merry v. State, (1975) Ind.App., 335 N.E.2d 249.

6. The State points up that appellant and X had sex prior to their marriage, thus, it is argued, negating the claim that X's knowledge of appellant's lower body was gained solely during the marriage. However, this argument does not affect her testimony concerning the hernia scar because appellant's hernia operation occurred during their marriage.

we assume appellant is correct and hold the marital privilege applicable to X's testimony, any error must be deemed harmless on the basis of other equally persuasive evidence. *Chatman v. State*, (1975) 263 Ind. 531, 334 N.E.2d 673; *Hunter v. State*, (1977) Ind.App., 360 N.E.2d 588, *cert. denied*, 434 U.S. 906, 98 S.Ct. 306, 54 L.Ed.2d 193.

The first basis for our determination involves the testimony of Detective James Mitchell.[7] He was the arresting officer and during booking procedures asked appellant to display his hernia scar. From this observation, Detective Mitchell testified appellant's hernia scar was "consistent with" the scar portrayed in the photographs.

Secondly, any error in X's testimony was rendered harmless by virtue of appellant's display of his abdomen and thighs to the jury. This evidential exhibition, clearly viewed by all members of the jury and compared by them to the photographic exhibits, surely dispelled any doubts they might have had regarding the identification testimony. Seldom has a finder of fact had such a unique opportunity to view first hand such crucial, if not ultimate, evidence.

In light of the compelling nature of this evidentiary presentation, in addition to the testimony of Detective Mitchell, we hold any error in the admission of X's testimony harmless.

### III. *SUFFICIENCY OF THE EVIDENCE*

Appellant's final assertion of error attacks the sufficiency of the evidence. More specifically, it is argued the identification testimony was insufficient to establish appellant was the male portrayed in the photographs. We disagree and, contrary to appellant's argument, think the evidence indicates more than appellant's opportunity to commit the crime.

The commission of the crime of sodomy cannot seriously be disputed. In graphic detail, State's Exhibits 1 and 2 photographically depict the prohibited sexual activity. The identity of the male in the photographs is not nearly as clear, however. Unlike all other cases our research has revealed, the facial features of the male are not visible. This deficiency has been more than overcome, however, by strong identification evidence, both circumstantial and direct.

The location of the sexual act was established to be the living room of appellant's house. Appellant was the only adult male who lived in or was given access to the home during the time the pictures were taken. The photographs were found in appellant's darkroom. Also, appellant was a professional photographer who possessed the equipment and expertise necessary to produce the photographs. This evidence, though circumstantial, tends to show appellant may have been the male depicted in the photographs.

This tendency is elevated to a near certainty once the personal identification evidence is considered. Both X and Detective Mitchell identified appellant's hernia scar as the one shown in the photographs. X also testified that she recognized the lower body of the male as her former husband's. Last, and certainly not least, the jury viewed appellant's thighs and lower abdomen, including the hernia scar. We think this evidence was more than sufficient to sustain the verdict.

Affirmed.

MILLER, P. J., concurs.

YOUNG, J., dissents with opinion.

YOUNG, Judge, dissenting.

I dissent.

It is not proper to permit the photographs to be admitted into evidence under current Indiana law regarding the foundation for admissibility of photographs. The majority

---

7. Although appellant objected to the introduction of this testimony at trial, the issue was not raised in the motion to correct errors or brief. Any error is therefore waived. Ind. Rules of Procedure, Appellate Rule 8.3.

correctly states the traditional rule for the admission of photographic evidence. They also state that this case is singularly concerned with the foundation requirement and suggest that the "independent silent witness" theory be adopted as an alternative to the current "pictorial testimony" theory. I would treat it as an exception and require more exacting standards of trustworthiness.

Initially, there are significant distinctions in the examples of where the "independent silent witness theory" is said by the majority to be applied and its application in this case. In the cases supportive of the "silent witness theory" extreme care is taken to assure the veracity of the offered exhibit particularly with regard to the mechanical process by which the same is recorded. The foundation requirements regarding the camera angle, lighting, exposure, type of film, lens used, and other data should be readily determinable by expert testimony. The danger of accepting the "silent witness theory" without these safeguards is the possibility of misleading evidence. Posed photographs could result which would not fairly and accurately depict an act or occurrence.

The first example cited by the majority of unintentional utilization of the silent witness theory occurs when x-rays are admitted into evidence. As the majority allows in footnote 2, in Indiana x-rays are treated as scientific evidence, as contrasted to photographic evidence. *Howard v. State*, (1976) 264 Ind. 275, 342 N.E.2d 604; III J. Wigmore, Evidence § 795 (Chadbourn rev. 1970). Consistent with this rationale, Wigmore states that an instrument which furnishes an abnormal aid to the senses may be employed as a "source of testimonial knowledge." The x-ray as a source of testimonial knowledge is similar to other data on which a physician would base a diagnosis. Preliminary testimony is required to show the trustworthiness of the process and correctness of the particular instrument. Wig-

more states that the concern here is the source of a witness' knowledge and not his mode of communication.[1] The x-ray is like other scientific data on which a physician relies in making a diagnosis. The foundation for such data is specialized and differs from traditional photographic evidence. I do not believe that an x-ray is evidence which could "speak for itself" and it has not been admitted on that rationale. The use of a photograph in this case is different from how an x-ray is used.

There are no Regiscope cases from Indiana cited by the majority nor do I locate any. It appears to me that those jurisdictions allowing the introduction of these types of photographs without the traditional foundation find the basis for trustworthiness in the procedure underlying the transaction. In *State v. Tatum*, (1961) 58 Wash.2d 73, 360 P.2d 754, and *Sisk v. State*, (1964) 236 Md. 589, 204 A.2d 684, the courts held as part of the foundation that the photograph accurately portray the subjects illustrated. In each case there was lengthy testimony regarding the underlying process. For example, the following description is taken from *Sisk*, 204 A.2d at 686–87.

William Shraver, Chief Investigator for Montgomery Ward, was then called. He stated that he received the check from the Chief Cashier after it was returned unpaid; that he went to the cashier's cage where there is located a Regiscope camera and removed the film therefrom and sent it, by mail, to the "Regiscope Company" in Fairfax, Va., with a description of the check and the Bates number thereon, and a request for a picture. The witness further testified that he had taken a course of instruction on the operational procedure of the Regiscope Company, which included a complete explanation of the camera and its functions and the company's procedures for developing and storing the film, etc., so that he was "thoroughly familiar with their operation." The Bates numbering machine is

1. Wigmore allows, as the majority points out, that the silent witness theory "may be" a more satisfactory rationale. Wigmore § 795, n. 1.

one so designed that each time the machine is stamped the number printed by it is changed one digit. The number is printed in the center of the top of the check and in the instant case is 136278. As requested by the witness, the "pictures" were returned to him by mail. The picture, which was later introduced into evidence, was "a complete photograph of a transaction of cashing the check. The bottom part of the photograph is a picture of the person cashing the check and the top part * * * is the check and the identification used to cash the check." The Regiscope pictures are taken with a camera which contains two lenses; one points straight forward in the direction of the person cashing the check; the other points down in the direction where the check and the identification are laid on the base of the camera. The camera is operated by a single lever, which, when pushed, takes two pictures, simultaneously, on the same negative. The picture, State's Exhibit 2, contains a picture of the check involved herein, which had been previously identified. The camera has a fixed focus; so the farther away a person is from the front of the camera, the smaller a person appears upon the picture. From his experience, it was witness' opinion that appellant was against the counter just outside the cage window when the picture was taken. On September 28, 1962, the witness had a conversation with the appellant. After looking at the picture, State's Exhibit 2, appellant stated that the person pictured thereon was he; that he had cashed a check "at Montgomery Ward that day," but not the check on the picture; and that he did not care to tell "what the other check was."

Upon cross examination, the witness stated that he was not present when the Regiscope picture involved was taken, or the negatives developed. His opinion at this time was different from that expressed at the first trial. He did not now believe that it would be possible for one cashier to photograph six different people with the same check (as he had testified at the first trial), nor did he believe it possible to photograph the same person with six different checks; because each person is required to produce a separate identification, and that identification is returned to each individual after each photograph is taken, and, should a different check than the one actually presented be placed on the platform to be photographed along with the person who has presented the check, it would not match up with the identification used. In the witness' opinion, for a Regiscope photograph to show a person other than the one intended to be photographed, the one so intended "would have to step completely away from the window and someone else step up to the window."

Marian Stevens, who had been head cashier at the store for some 5 years, said she and her assistants cashed about 25 to 30 checks a day and they had operated the Regiscope machine on many occasions. She could not say whether it was she, or one of the assistants, who took the picture. The camera "sets right up front," on the front counter, inside "her cage." The camera can only be operated by one person at a time; it is movable, and is turned to one side when not being utilized; when being used, "we slide it in front of the window" and take a picture. The camera is only operated at one window, which is a small one "up top of a counter" (upon which a special light had been installed) so that the person whose picture is being taken is "right in front of you." The witness stated the picture was "taken at Montgomery Ward. The Bargain Room is in the background, and that would be a picture of the person, the check, and their identification."

Joseph E. Slattery, an employee of Filmdex Corporation known as Regiscope, explained in detail (and demonstrated to the court below) how the camera works, and he also explained how his company processes and stores the films. Much of his testimony corroborated and confirmed that of the witnesses Shraver and Stevens; consequently, only the portions of

his testimony that added to theirs will be set forth. Regiscope received the roll of films and the request for a picture (by specific number, name of company, name of bank and so forth). The witness did not develop the negatives himself, but he examined the roll of developed film in the film reader and found the negative of the "particular transaction." An enlargement of it was made and sent to Montgomery Ward as requested. The enlargement was a true representation of the negative. The witness also examined the transactions on the roll of film immediately preceding and following the subject one, and found them to be full and complete transactions; the first was a picture of a woman who cashed a Treasurer of the United States check; the latter a man who also cashed a Treasury check.

The film used in taking the Regiscope pictures is perforated on one side only, so the film "cannot be put in reverse" as this would tear the perforations. Hence, on the finished picture, the check is always above the person's picture. The camera used at Montgomery Ward's store has a fixed focus, with a depth of field of approximately three feet.

In a Regiscope case, the process assures trustworthiness and authentication for the photograph, unlike the situation in this case.

The trustworthiness for photographs in bank robbery cases also relies on the process of recording. In *United States v. Taylor*, (1976 5th Cir.) 530 F.2d 639, the showing of reliability involved the following description of the process.

In the case before us it was, of course, impossible for any of the tellers to testify that the film accurately depicted the events as witnessed by them, since the camera was activated only after the bank personnel were locked in the vault. The only testimony offered as foundation for the introduction of the photographs was by government witnesses who were not present during the actual robbery. These witnesses, however, testified as to the manner in which the film was installed in the camera, how the camera was activat-

ed, the fact that the film was removed immediately after the robbery, the chain of its possession, and the fact that it was properly developed and contact prints made from it. Under the circumstances of this case, we find that such testimony furnished sufficient authentication for the admission of the contact prints into evidence. Admission of this type of photographic evidence is a matter largely within the discretion of the court, and it is clear that the district court did not abuse its discretion here.

530 F.2d at 641–42 (citations omitted). It appears that if the proper foundation were laid as in *Taylor*, Indiana would allow such photographs to be admitted into evidence. *See Murry v. State*, (1979) Ind.App., 385 N.E.2d 469, 472. Here again, there is no showing in this case of a reliable trustworthy process by which the photographs were made and presented.

I agree that the verification requirement should be understood in a relative sense. Annot., 9 A.L.R.2d 899 (1950). "The proof which one should offer in verifying a photograph varies with the nature of the evidence which the photograph is offered to supply and the degree of possibility of error in the photograph." *Id.* at 900. The annotation reasons that different degrees of accuracy are required when the photograph is of a handwriting as compared to a photograph of a person for purposes of identification. The purpose for which a photograph is used determines the relative verification. When a photograph is used as substantive evidence, the need for certainty and accuracy is greater because there is no witness able to explain any distortions, inaccuracy or changes.

The more general use of photographs in court has been hindered by the feeling rather widely held, that so-called trick photography can distort the real facts. The truth is cameras *do* lie. . . . The elimination of the dangers of false or "trick" photographs lies not in rigid rules excluding photographs generally but in the careful qualification of such photographs on their preliminary examination.

Gardner, *The Camera Goes to Court*, 24 N.C.L.Rev. 233, 235 (1946). This article, supporting the admissibility of photographs as substantive evidence, states that perhaps the reason for the illustrative only rule is that few judges and lawyers are familiar enough to examine adequately and quickly the competency of a photograph. It then lists possible sources of distortion (recognized by the majority). *Id.* at 236–238. The "tendency to accept as true what is mirrored in photographs has wide and more important implications. It renders doubly important that the photographer have available for each picture such details as the position of the camera, the distance from the object, the angle and type of lens, the time of day, the date, and similar data . . . ." *Id.* at 238. An analysis of the rule allowing use of photographs as substantive evidence requires that its competency be shown prior to admission. As has been discussed above, the "tendency to accept as true what is mirrored in a photograph" requires very strict rules for admitting a photo as substantive evidence. In this case the photograph is to be used as the only substantive evidence of a crime without even the degree of authentication required in a Regiscope or bank robbery case.

It may also be noted that except in sex offenses there is independent competent evidence of the crime. In the Regiscope cases there is evidence that a bad check has been passed when it is returned paid to the store. This is also true in a bank robbery case.

I would limit the use of the "silent witness theory" to cases where it is shown there is no possibility that the traditional foundation could be proved. It should be treated as an exception to the general rule, not as an alternative. The foundation required of other "exceptions" to the traditional rule has not been laid in this case and for that reason I would hold the photographs were improperly admitted.