## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 25 2016, 6:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Russell W. Brown, Jr.
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ralph Martinez,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 25, 2016<br><br>Court of Appeals Case No.<br>45A03-1602-CR-292<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Diane Ross Boswell, Judge<br><br>Trial Court Cause No.<br>45G03-1304-MR-4 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Ralph Martinez (Martinez), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1, and robbery, a Class C felony, I.C. § 35-42-5-1, following a jury trial.

We affirm.

## ISSUES

Martinez raises three issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion by admitting Martinez' cell phone, which was seized during a search of the residence;

(2) Whether the trial court abused its discretion by admitting surveillance video pursuant to the silent witness theory; and

(3) Whether the trial court acted within its discretion by issuing a blanket order that no re-cross examination would be allowed.

## FACTS AND PROCEDURAL HISTORY

In 2013, Mary Austgen (Austgen) and her adult children owned and operated several businesses in Griffith, Indiana, with the main office located at 801 East Main Street in Griffith. Austgen herself operated several rental storage units in Griffith, Highland, and Lowell. In 2009, Austgen had rented a storage unit in Griffith to Martinez. However, by 2012, Martinez had become delinquent in his rent payments and Austgen sent him two eviction notices, respectively in February 2012 and in September 2012.

On March 28, 2013, Martinez received a ride from his friend, Antonio Rodriguez (Rodriguez), from his residence in Alsip, Illinois, to Austgen's business in Griffith. Surveillance video taken inside the business shows that Martinez entered the building at approximately 2:45 p.m. that afternoon and walked up a short flight of stairs into the small reception area that included a public restroom. By 5:00 p.m. that day, Austgen was the last person in the building. Shortly after 5:00 p.m., Austgen prepared to leave. As she was leaving via the front stairwell, she was attacked from behind and pushed to the floor by Martinez. Martinez pointed a handgun at her head. After a short period of time during which he appeared to be talking to Austgen, Martinez helped Austgen up, picked up her purse and contents, and ordered her to move back up the stairs toward the offices. Inside, Martinez and Austgen walked into Austgen's personal office. Approximately twenty minutes later, they exited the building via the front stairwell. Once outside, Austgen entered the driver's seat of her GMC Yukon with Martinez entering the rear passenger's seat behind her.

At 6:06 p.m., the Yukon entered the parking lot of the Majestic Star Casino in Gary, Indiana, and parked on the second level. About ten minutes later, Martinez exited the parking garage alone and on foot. He entered the casino and walked to the front valet area. Once there, Martinez called his friend, Jose Del Rio (Del Rio), asking for a ride back to his residence in Alsip. Del Rio picked Martinez up around 6:30 p.m.

By 10:00 p.m. that night, Austgen's family realized that Austgen was missing. They met at the main office in an attempt to locate her. Being unsuccessful, the family contacted the Griffith Police Department to file a missing person report and OnStar was called upon to locate Austgen's Yukon. OnStar reported that the Yukon could be found at the Majestic Star Casino. While police officers and family members drove to the Casino, Michael Austgen (Michael), Austgen's son, remained in the office to access and view the surveillance video. After locating the Yukon in the parking lot, the search party found Austgen dead in the passenger's seat, having died from a single gunshot wound to the abdomen. Although she was still wearing her watch, necklace, and earrings, she was missing her pinkie rings—one of which was gold with diamonds and the other silver with diamonds.

Police officers took custody of the internal and external surveillance videos. After accessing the interior surveillance video, officers observed Martinez' entry in the stairwell, his attack on Austgen, and the twenty-minute period inside Austgen's office. The officers also noticed a glow from Martinez' hand in the dark stairwell, which would be indicative of a cell phone. The officers created still photos from the surveillance video which they showed to Austgen Electric employee, Susan Johnson (Johnson). Although Johnson was unable to immediately identify Martinez, she quickly found his name after sorting through Austgen's renter card system. Johnson notified Griffith Police detective James Sibley (Detective Sibley). Detective Sibley located Martinez' driver's license and an address, but was unable to find him. However, the

Detective obtained Martinez' cell phone number from the person residing at the address on the driver's license.

[9] On April 23, 2013, the police, for a second time, released still photographs from the Austgen business surveillance video to the public. This time, they also included a photograph of Austgen and her two missing pinkie rings. Martinez and Catalina Noriega (Noriega) saw the photographs on the evening news. Martinez and Noriega were previously married and have three children together; in April 2013, they were living together in the residence in Alsip, Illinois. After Noriega stated that the person on the news looked like Martinez, Martinez denied the resemblance, replying that the person in the broadcast was "fat" and "bigger." (Transcript p. 573). Hearing Austgen's name, Noriega exclaimed, "Oh, my God. That's that lady that you rent from." (Tr. p. 575). Martinez confirmed this, and he very calmly responded, "Rich people get killed all the time." (Tr. p. 575). After seeing Austgen's rings displayed on the screen, Noriega recalled seeing the gold pinkie ring on her bedroom dresser a few weeks earlier. When Martinez had retired to bed, Noriega called her three adult daughters. Noriega's three daughters confirmed that the person pictured in the Austgen building's stairwell was their father. All four contacted the Griffith Police Department the following morning, identifying Martinez as the suspect in the news broadcast the previous evening. Noriega also confirmed that Martinez owned a small silver gun, which he usually kept in a bag in the closet.

[10] Detective Jacob Schoon (Detective Schoon) obtained a search warrant for Martinez' cell phone records from US Cellular and Google, which indicated that Martinez had made calls to Rodriguez and Del Rio on March 28, 2013. Although Noriega consented to a search of her residence in writing, officers also obtained a search warrant for the residence, as well as Martinez' car. The search warrant specifically provided for the seizure of jewelry, firearms, Martinez' clothing and "any biological material contained therein," and "any indicia thereof which have been used in the commission of or which constitutes evidence of the offense of First Degree Murder." (Exh. Vol. 3, State's Exh. 3, p. 3). During the execution of the warrant, officers seized three .45 caliber live rounds, Martinez' cell phone that was sitting on a coffee table in the living room, one pair of jeans, and a pair of sunglasses.

[11] A subsequent search warrant was obtained for the contents of Martinez' cell phone. The location history derived from the cell phone showed that on March 28, 2013, Martinez travelled from his residence in Alsip to Austgen's business in Griffith and from there to the Majestic Star Casino in Gary and was back in Alsip by 7:30 p.m. Both Rodriguez and Del Rio were listed as contacts in Martinez' cell phone. Cell phone tower location evidence corroborated Martinez' route on March 28, 2013.

[12] On April 25, 2013, the State filed an Information, charging Martinez with murder, felony murder, Class A felony robbery, and Class B felony criminal confinement. While he was incarcerated and awaiting trial, Martinez placed a video call to one of his daughters. In the call, Martinez affirmed that she had

done the right thing and that he was the person on the surveillance video, "no question." (State's Exh. 7). By June of 2015, Noriega's home in Alsip, Illinois, was under foreclosure proceedings. Noriega offered her sister the opportunity to remove any fixtures that she wanted from the residence. While removing the ceiling fan from the bedroom, Austgen's two pinkie rings fell to the floor. Noriega identified the gold ring as the one she had noticed on her bedroom dresser two years earlier.

[13] Prior to trial, Martinez moved to suppress the evidence derived from a search of his cell phone. After a hearing, the trial court denied the motion. The trial court conducted a jury trial beginning August 11, 2015, which spanned eight days. At the close of the evidence, the jury found Martinez guilty as charged. During the sentencing hearing on January 7, 2016, the trial court vacated the jury's guilty verdict for felony murder and criminal confinement on double jeopardy grounds and reduced Martinez' robbery conviction to a Class C felony. The trial court imposed a sixty-year sentence for murder and a consecutive seven-year term for the Class C felony robbery conviction.

[14] Martinez now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Martinez' Cell Phone*

[15] Martinez now contends that the trial court abused its discretion by admitting his cell phone into evidence. Specifically, Martinez alleges that the search

warrant obtained by law enforcement prior to searching Noriega's residence did not specifically include the seizure of his cell phone. As such, he maintains that his cell phone was seized in violation of the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.[1]

[16] Rulings on the admissibility of evidence fall within the sound discretion of the trial court. *Wise v. State*, 26 N.E.3d 137, 140-41 (Ind. Ct. App. 2015), *trans. denied*. We review such rulings for an abuse of that discretion, which occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

[17] The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . ." The Fourth Amendment generally prohibits warrantless searches. *Edwards v. State*, 762 N.E.2d 128, 132 (Ind. Ct. App. 2002). If a warrantless search is conducted, the burden is on the State to prove that, at the time of the search, an exception to the warrant requirement existed. *Peel v. State*, 868 N.E.2d 569, 575 (Ind. Ct. App. 2007). That is, searches conducted without a warrant are per se unreasonable, subject to a few well-delineated exceptions. Although Martinez focuses on the search warrant obtained by the officers to search the residence to support his claim that the cell

---

[1] Even though Martinez alludes to a violation of his Indiana Constitutional rights, he makes no separate analysis pertaining thereto. Because he did not present any authority or independent argument supporting a separate standard under the state constitution, his claim is waived. *Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002).

phone was not included in the list of items permitted to be seized pursuant to the warrant,[2] Martinez fails to question Noriega's signed consent to search the residence.

[18] "The Fourth Amendment recognizes a valid warrantless entry and search of the premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained. *Gado v. State*, 882 N.E.2d 827, 832 (Ind. Ct. App. 2008) (citing *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S.Ct. 1515, 1518, 164 L.Ed.2d 208 (2006)), *trans. denied*. Authority to consent to a search can be either apparent or actual. Actual authority requires a sufficient relationship to or mutual use of the property by persons generally having joint access to or control of the property for most purposes. *Halsema v. State*, 823 N.E.2d 668, 677 (Ind. 2005). A consenting party with actual authority over property may permit the search in his or her own right. *Lee v. State*, 849 N.E.2d 602, 606 (Ind. 2006), *cert. denied* 549 U.S. 1211 (2007).

[19] Noriega testified that she resided in the house in Alsip prior to Martinez moving in with her "roughly" two years before the murder took place. (Tr. p. 566). She characterized Martinez' living arrangement as a "roommate." (Motion to Supp. Tr. p. 8). In her consent that she willingly signed, Noriega authorized police officers to "search [her] residence located at [Alsip, Illinois,]

---

[2] Because we affirm based on consent, we do not need to address the State's claim that the search warrant's language was broad enough to encompass the seizure of the cell phone.

and search any contents found there in[.] I further authorize said Officers to remove from my residence, real property and/or motor vehicle, whatever documents or other items of property whatsoever, which they deem pertinent to their investigation[.]" (Exh. Vol. 3, State's Exh. 2). During the motion to suppress hearing, Detective Sibley stated that from his review of the surveillance video of Austgen's business, "there was a glow in one of [Martinez'] hands that appeared to me to be a cellular phone." (Motion to Supp. Tr. pp. 28-29). Accordingly, as the cell phone was in plain view in the living room and Noriega, having actual authority over the residence, had given permission to seize all property that would be pertinent to the officers' investigation, the seizure of Martinez' cell phone did not violate his Fourth Amendment rights.

## II. *Silent Witness*

[20] Next, Martinez contends that the trial court abused its discretion when it admitted the surveillance video under the silent witness theory. He maintains that the State failed to establish the authenticity of the scene depicted and the accuracy of the video equipment as mandated by the foundational requirements under the silent witness theory.

[21] As with Martinez' cell phone argument, we review his challenge to the admission of the surveillance video under an abuse of discretion standard. Accordingly, an abuse of discretion occurs when the trial court's decision is

clearly against the logic and effect of the facts and circumstances before it. *Wise,* 26 N.E.3d at 140-41.

[22] The silent witness theory, as first adopted by this court, permits the admission of photographs as substantive evidence, rather than merely as demonstrative evidence, so long as the photographic evidence is also relevant. *Bergner v. State*, 397 N.E.2d 1012, 1014-15 (Ind. Ct. App. 1979). Addressing solely the question of foundation, the *Bergner* court hesitated to set forth "extensive, absolute foundation requirements," and instead mandated a "strong showing of the photograph's competency and authenticity." *Id.* at 1017. Thus, the *Bergner* court warned against the problems of distortion of images and the possibility of their alteration in a manner that misrepresents the image taken. Where images were taken by automatic devices, the *Bergner* court stated, "there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and chain of custody of the film after its removal from the camera. *Id.*

[23] The silent witness theory has continued in use since its adoption by Indiana courts in 1979, and has since been extended to the use of video recordings. *See, e.g., Mays*, 907 N.E.2d 128, 131-32 (Ind. Ct. App. 2009), *trans. denied*. As applied to video recordings:

> [T]here must be a strong showing of authenticity and competency and . . . when automatic cameras are involved, there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs

> were taken, and the processing and changing of custody of the film after its removal from the camera.

*McHenry v. State*, 820 N.E.2d 124, 128 (Ind. 2005) (citing *Edwards v. State*, 762 N.E.2d 128, 136 (Ind. Ct. App. 2002), *trans. denied*). This standard is applied "where there is no one who can testify as to [the recording's] accuracy and authenticity because the photograph must 'speak for itself' and because such a 'silent witness' cannot be cross-examined." *Edwards*, 762 N.E.2d at 136.

[24] The Indiana Supreme Court recently addressed the silent witness theory, and observed that its "foundational requirements . . . are vastly different [than] the foundational requirements for demonstrative evidence." *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014) (internal citations and quotation marks omitted). In cases involving the silent witness theory, a witness need not testify that the depicted image is an accurate representation of the scene on the day on which the image was taken, and "often could not so testify since he or she was not necessarily there to observe the scene on that day." *Id*. Rather, the witness must provide testimony identifying the scene that appears in the image "sufficient to persuade the trial court . . . of their competency and authenticity to a *relative certainty*." *Id*.

[25] Testimony at trial established that the surveillance system at the Austgen buildings had been operational for "several years" and had been installed by Southlake Security. (Tr. p. 331). Michael, Austgen's son, was in charge of the system's maintenance and control, which consisted of "forty to fifty cameras" throughout the property, recording both interior and exterior images on four

devices. The system was fully automatic and operated "on its own." (Tr. p. 334). Michael testified that they "didn't usually mess with that too much" and reviewed the recordings "every week or two weeks." (Tr. pp. 334, 332). He stated that on the day of the murder, the system was fully operational and was showing correct dates. However, he also clarified that "the actual time showing" on the recordings was "off." (Tr. p. 334).

[26] Testimony from Austgen's children affirmed the authenticity of the still photographs taken directly from the interior surveillance video unit at the front entrance and identified the location shown in the photos. No evidence of tampering was submitted. Detective Sibley explained that after taking possession of the videotapes, only he and the city IT director had access to the recordings. The city IT director burned a copy directly from the tapes onto the police server. Although Michael had not been able to access the internal surveillance video from his desktop at the office, this does not tarnish the video's authenticity. The city IT director elaborated that nothing was wrong with the video itself, only Michael's desktop computer was too old to access the interior video recording. Based on the evidence presented by the State, we agree with the trial court that the foundational requirements for the silent witness theory were established and Martinez' challenge to the admission of the surveillance videos fails.

### III. *Re-Cross Examination*

[27] Lastly, Martinez asserts that the trial court abused its discretion when it denied him the opportunity to re-cross examine witnesses. Martinez argues that the trial court's "categorical denial" to allow re-cross examination of witnesses violated his Constitutional rights. (Appellant's Br. p. 14).

[28] During the trial proceedings, the trial court informed Martinez that it doesn't "give re-cross" because "it's never-ending[.]" (Tr. p. 167). Martinez responded, "Alright" and did not object. (Tr. p. 167). Later, as part of its presentation of its case in chief, the State elicited testimony from Noriega. On cross-examination, Martinez attempted to introduce a new line of questioning about third parties' access to Noriega's residence. Specifically, Martinez referred to Noriega's brother, Jose Noriega (Jose), who had passed away on April 11, 2014. He elicited testimony that Jose "had a key to [Noriega's] house, so that he would come and go[,]" thereby alluding to the fact that Jose could have placed Austgen's rings in the bedroom's ceiling fan. (Tr. p. 610). On redirect, the State questioned Noriega about Jose's health and established that Jose was critically ill in 2013, and "in his end-stage alcoholism. He was always very tremulous, and he couldn't walk unless he had a walker, and definitely mentally he was not there." (Tr. p. 619). Although he now claims not to have been allowed to re-cross Noriega on Jose's illness, Martinez did not even request the trial court for an opportunity to re-cross but instead on appeal refers to the trial court's general mandate of no re-cross to support his argument.

[29] We find that Martinez waived his argument several times over. First, when the trial court notified Martinez that it would not allow re-cross examinations,

Martinez did not object or otherwise challenge the trial court's direction. *See Garrett v, State*, 737 N.E.2d 388, 391 (Ind. 2000). Moreover, with respect to Noriega's testimony, Martinez never requested the trial court for a re-cross opportunity, let alone asked the trial court for permission to make an offer of proof. The purpose of an offer of proof is to convey the point of the witness' testimony and provide the trial court the opportunity to reconsider the evidentiary ruling. *State v. Wilson*, 836 N.E.2d 407, 409 (Ind. 2005). Equally important, it preserves the issue for review by the appellate court. *Id*. To accomplish these two purposes, an offer of proof must be sufficiently specific to allow the trial court to determine whether the evidence is admissible and to allow an appellate court to review the correctness of the trial court's ruling and whether any error was prejudicial. *Id*. Accordingly, absent an offer of proof, Martinez waived the issue for our review.

[30] Waiver notwithstanding, we acknowledge a trial court's discretion in managing and controlling its proceedings. Indiana Rule of Evidence 611(a) explains that "[t]he court shall exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment." Ind. Evid. Rule 611(a) recognizes that the process of examining witnesses, while conducted by the parties, is subject to the control of the trial court, "which has a wide discretion therein." *Sowders v. Murray*, 280 N.E.2d 630, 635 (Ind. 1972). "Phases of the examination, such as the length and time that a witness shall be

examined, and the manner and mode of [] examination, are under the control of, and within the discretion of, the trial court. Likewise, the scope, extent, method and manner of cross-examination must be under the control of the trial court and rest in its sound discretion." *Id.* Here, the trial court notified the parties that it would not allow re-cross examination to prevent needless consumption of time. Moreover, we agree with the State's observation that, in light of the trial court's prohibition and because the line of questioning about Jose's access to Noriega's home was introduced by Martinez, Martinez could have called Noriega as his own witness to elicit the testimony he now deems missing. We conclude that the trial court did not abuse its discretion.

## CONCLUSION

Based on the foregoing, we hold that the trial court did not abuse its discretion by admitting Martinez' cell phone which was seized during a search of the residence or by admitting surveillance video under the silent witness theory. Additionally, we conclude that the trial court acted within its discretion by prohibiting re-cross examination.

Affirmed.

Bailey, J. and Barnes, J. concur