STATE OF NEBRASKA, APPELLEE, V.
GABRIEL RODRIGUEZ, APPELLANT.

726 N.W.2d 157

Filed January 19, 2007. No. S-04-631.

Mark A. Johnson, of Johnson, Morland, Easland & Lohrberg, P.C., for appellant.

Jon Bruning, Attorney General, and Susan J. Gustafson for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and SIEVERS, Judge.

CONNOLLY, J.

A jury convicted Gabriel Rodriguez of five counts of first degree murder and five counts of use of a weapon to commit a felony. The convictions arose from an attempted bank robbery that left five people dead. The district court sentenced Rodriguez to five terms of life imprisonment for the murders and five terms of 10 to 20 years' imprisonment for the weapons convictions, to be served consecutively. He appeals, contending the district court erred in several respects. The dominant issue is whether the court erred in not striking several jurors for cause.

Under Nebraska law, jurors who have formed or expressed opinions that the accused is guilty founded on witness accounts of the crime—as opposed to newspaper reports, hearsay, or rumor—must be excused for cause. Despite extensive publicity, no jurors expressed an opinion regarding Rodriguez' guilt founded on witness accounts. We affirm.

## I. RODRIGUEZ SCOUTS THE BANK;
## THE PLAN UNRAVELS

On September 26, 2002, Jose Sandoval, Jorge Galindo, and Erick Vela entered a bank in Norfolk, Madison County, Nebraska. They shot and killed four bank employees and a customer in a botched robbery. Rodriguez, Sandoval's half brother, acted as the "scout."

Galindo testified that he, Sandoval, and Rodriguez first discussed robbing the bank about a month before the killings. According to Galindo, Rodriguez was to drive the others near the bank and drop them off; then, Rodriguez would enter the bank and see how many people were inside.

On the morning of September 26, 2002, Rodriguez awoke at about 8 a.m. and informed his girl friend that he was leaving to take Sandoval to get a job application. About 8:20 that morning, Galindo testified, Rodriguez picked him up, with Sandoval and Vela already in the car. Galindo testified they drove by the bank "a couple times," and then Rodriguez dropped the others off about five blocks from the bank. A bank surveillance tape shows that Rodriguez entered the bank shortly after 8:30 a.m. He spoke briefly with a bank teller, looked around several times, and then left. He used a walkie-talkie to inform the others of how many people were inside the bank and their locations.

About 7 minutes after Rodriguez left the bank, Sandoval, Galindo, and Vela entered the bank, intending to rob it. Instead, the plan unraveled, and in a period of about 40 seconds, they shot and killed bank employees Samuel Sun, Jo Mausbach, Lisa Bryant, and Lola Elwood and customer Evonne Tuttle. Galindo testified that originally, he, Sandoval, and Vela planned to take a bank employee's car as their getaway. But because "[e]verything went wrong," they instead ran from the bank and stole a car from a nearby home. They then drove toward the hospital, where Rodriguez was supposed to pick them up. Before reaching the hospital, however, they decided to steal another car instead and fled toward O'Neill, Nebraska, where police later apprehended them.

According to Rodriguez' girl friend, Rodriguez arrived back at their apartment around 9 a.m. Rodriguez did not immediately tell her that he had been at the bank that morning. But just

before she left for work, he told her he had gone there to open an account. He told her that if anyone asked, she should say she had known he was opening an account and had gone with him.

Around 5 or 6 o'clock that evening, Rodriguez went to Denise Garvin's home in Columbus, Nebraska. While there, he cried in the presence of Garvin and her boyfriend, saying he had let his "brothers" down and felt bad because he was not there for them. Garvin, her boyfriend, and Rodriguez then went to Norfolk. Garvin testified that on the way there, Rodriguez cried and talked more about his "job." He said that his job that day was to look at the position of everyone in the bank and be the getaway driver. He also again stated that he let his "brothers" down because he got scared when he heard gunshots and took off. Once they arrived in Norfolk, they went to a residence there, where Rodriguez continued to discuss how he had let his brothers down. While at the residence, Rodriguez saw his picture on the news. He then left, stating that he was going to turn himself in. Police apprehended him outside his house around midnight.

## II. ASSIGNMENTS OF ERROR

Rodriguez assigns, restated, that the trial court erred in (1) failing to strike jurors who had read or heard witness accounts of the crime, (2) failing to strike jurors who were equivocal about their ability to be impartial, (3) failing to change venue because of pretrial publicity, (4) failing to suppress statements made by Rodriguez before he had received *Miranda* warnings, (5) failing to allow evidence to impeach a witness' testimony, (6) failing to allow inquiry into the burglary where the guns used in the bank robbery were obtained, and (7) imposing unconstitutional sentences.

## III. ANALYSIS

### 1. The Trial Court Did Not Err in Passing for Cause Jurors Nos. 7, 8, 25, 27, 39, and 44

Rodriguez contends that several of the jurors were incompetent to serve because they were exposed to excessive pretrial publicity detailing the crimes. He contends that under Neb. Rev. Stat. § 29-2006(2) (Reissue 1995), these jurors should have been

excused. That statute disqualifies jurors who have formed or expressed opinions of guilt founded on witness accounts.

### (a) Publicity, Juror Questionnaires, and Voir Dire

The murders generated extensive publicity in Madison County. The district court conducted extensive voir dire to determine whether Rodriguez could obtain a fair and impartial jury. The district court clerk's office sent jury questionnaires to 300 prospective jurors. Many if not all the prospective jurors' responses indicated that they had had some exposure to news accounts of the killings. Despite this, about 63 percent responded that they could render a verdict from only the evidence and testimony presented at trial. During voir dire, 60 people were individually questioned to obtain a panel of 42, from which the final jury and alternates were selected.

Rodriguez contends that the court should have removed several jurors for cause because of their answers to the questionnaires and their answers during voir dire.

Juror No. 7 stated that he had heard about the murders on the radio and read articles in the newspaper, including witness accounts. He had seen headlines about the trials of the others charged in the crime, but he stated he had not read anything recently. He did not have or express an opinion about Rodriguez' guilt or innocence.

Juror No. 8 stated that he had been exposed to the facts of the case through newspaper, television, and radio accounts. He stated that he expressed an opinion as to Rodriguez' guilt "in passing," but that he had not formed an opinion in his "own mind" and believed Rodriguez was innocent until proved guilty. He also had read reports of witness testimony, but had not formed an opinion from the reports.

Juror No. 25 stated that he heard about the murders through newspaper and television coverage. He stated that he had not heard any accounts of the other trials. When asked whether he had reached a conclusion regarding Rodriguez' guilt or innocence, he stated he thought Rodriguez "probably facilitated the whole crime." He said this was his understanding because of the media and "hearsay . . . that there's videotapes" placing Rodriguez at the bank. But he had not heard that information

from any witnesses. Juror No. 25 also testified that he would be willing to presume Rodriguez was innocent, would make a decision based only on the evidence, and would require that the State meet its burden to prove him guilty.

Juror No. 27 stated that he had read newspaper accounts of the murders but that he had not formed or expressed an opinion regarding Rodriguez' guilt or innocence. He also stated he did not believe the death penalty was appropriate for Rodriguez because Rodriguez "didn't do the killings."

Juror No. 39 stated that he followed the media coverage of the murders in the newspapers and on television and radio. But he had not formed an opinion as to Rodriguez' guilt or innocence. He did testify, however, that he would require Rodriguez to present evidence of his innocence. But upon further questioning and clarification by the judge, he stated that he could hold the State to its burden to prove guilt beyond a reasonable doubt.

Juror No. 44 stated that she had read newspaper accounts and also had discussed the case with a coworker who witnessed part of the robbery. The coworker expressed the opinion that Rodriguez was guilty. Juror No. 44 stated, however, that she had not formed an opinion as to Rodriguez' guilt or innocence based on either the newspaper or witness accounts.

### (b) Jurors Nos. 7, 8, 25, 27, 39, and 44 Did Not Express Opinions of Rodriguez' Guilt Founded on Witness Accounts

██ Rodriguez contends that the court should have removed for cause jurors Nos. 7, 8, 25, 27, 39, and 44. Section 29-2006 governs the removal of jurors for cause. It provides in pertinent part:

The following shall be good causes for challenge to any person called as a juror or alternate juror, on the trial of any indictment: . . . (2) that he has formed or expressed an opinion as to the guilt or innocence of the accused; *Provided*, if a juror or alternate juror shall state that he has formed or expressed an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror or alternate juror as to the

ground of such opinion; and if it shall appear to have been founded upon reading newspaper statements, communications, comments or reports, or upon rumor or hearsay, and *not upon conversations with witnesses of the transactions or reading reports of their testimony or hearing them testify*, and the juror or alternate juror shall say on oath that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that such juror or alternate juror is impartial and will render such verdict, may, in its discretion, admit such juror or alternate juror as competent to serve in such case . . . .

(Emphasis supplied.) Thus, if a person called as a juror has formed or expressed an opinion as to the guilt or innocence of the accused and such opinion was "founded upon 'conversations with witnesses of the transactions or reading reports of their testimony or hearing them testify' the dismissal of such a juror is mandatory." *State v. Myers*, 190 Neb. 466, 469, 209 N.W.2d 345, 348 (1973). Accord *Flege v. State*, 93 Neb. 610, 142 N.W. 276 (1913). But if the opinion is founded instead on " 'rumor, newspaper reports, or hearsay, and it shall satisfactorily appear that the character of such opinion is such that it will not interfere with [the juror's] rendering an impartial verdict, it is not error to admit him to the jury.' " *King v. State*, 108 Neb. 428, 437, 187 N.W. 934, 937-38 (1922). See, also, *Ringer v. State*, 114 Neb. 404, 207 N.W. 928 (1926); *Whitcomb v. State*, 102 Neb. 236, 166 N.W. 553 (1918). And the trial court's decision to retain or reject a venireperson as a juror is discretionary and will be reversed only when clearly wrong. See *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001).

In *Flege, supra*, this court reversed the defendant's conviction and remanded the cause because erroneous jury instructions and evidentiary rulings prejudiced the defendant. At his second trial, the defendant challenged several jurors for cause. Each challenged juror stated that he had read reports of witness testimony from the first trial, had formed an opinion of guilt based on the testimony, and would need a reason to change his opinion. After questioning, each juror agreed that he could render a fair and impartial verdict. But because the jurors based

their opinions on witness testimony, we held the jurors were not impartial. In contrast, in *Ringer, supra,* jurors who formed opinions based on newspaper articles but who stated they could lay aside those opinions were qualified.

Here, Rodriguez contends that six jurors were incompetent under § 29-2006(2). We disagree. Jurors Nos. 7, 27, 39, and 44 all unequivocally stated that they had not formed or expressed opinions regarding Rodriguez' guilt or innocence. Section 29-2006(2) does not disqualify jurors unless they have done so. Therefore, the statute and *Flege* do not apply. The district court did not err in failing to excuse these jurors for cause.

Although juror No. 8 testified he had expressed an opinion "in passing," he also stated that he had not formed an opinion. He testified he had read reports of witness testimony, but had not formed an opinion from them. Assuming that juror No. 8 had expressed an opinion that would bring him within § 29-2006(2), he did not state that his opinion was "founded" upon reading reports of witness testimony. Similarly, juror No. 25 expressed the opinion that Rodriguez had "facilitated" the whole crime. Yet, he testified that he had not heard any witness accounts. So, while jurors Nos. 8 and 25 both expressed an opinion, neither juror formed an opinion founded on witness testimony. Moreover, both jurors stated they could render an impartial verdict. The court properly exercised its discretion when it retained them as competent jurors. See, § 29-2006(2); *Ringer, supra.*

## 2. RODRIGUEZ DID NOT SHOW THAT HE WAS PREJUDICED BY THE COURT'S FAILURE TO STRIKE PROSPECTIVE JURORS

In addition to jury members, Rodriguez argues prospective jurors Nos. 12, 19, 20, and 30 should have been struck under § 29-2006(2). Rodriguez used peremptory challenges to strike prospective jurors Nos. 12, 19, and 20, and the State used a peremptory challenge to strike prospective juror No. 30.

Rodriguez also contends the district court should have excused prospective jurors Nos. 9, 58, and 61 because they expressed opinions of guilt and stated that they would only "try" to be impartial, not that they would or could. He argues that this

prevented him from receiving a fair trial. These panel members, however, were not on the jury. Rodriguez used peremptory challenges to strike prospective jurors Nos. 9 and 58, and the State used a peremptory challenge to strike prospective juror No. 61.

We have previously addressed whether a court's failure to strike prospective jurors who were not selected for the jury prejudices the defendant. In *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001), the defendant argued that he was denied a fair trial because the court failed to strike a prospective juror whom he challenged for cause. The defendant instead had to use one of his peremptory challenges to remove the juror. In deciding that the defendant was not prejudiced, we stated:

> The true object of challenges, either peremptory or for cause, is to enable the parties to avoid disqualified persons and secure an impartial jury. When that end is accomplished, there can be no just ground for complaint against the rulings of the court as to the competency of jurors. . . . Even where a party's peremptory challenges are exhausted, the erroneous overruling of a challenge for cause will not warrant reversal *unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges.*

(Citations omitted.) (Emphasis supplied.) *Id.* at 52, 621 N.W.2d at 134. We further stated that the burden is on a defendant to show that he used all his peremptory challenges and that he would have used some of those challenges to remove other biased jurors if not for the error. Because the defendant did not show that he had used all his peremptory challenges or that a biased juror sat on the jury as a result of the trial court's ruling, we held that he was not prejudiced.

Here, Rodriguez used all of his peremptory challenges. He did not, however, argue that he would have used his peremptory challenges on any of the jurors if he had not used them on these prospective jurors. He contended for the first time at oral argument that he would have used his challenges on other jurors, but he did not argue that point in his brief. To be considered by an appellate court, an appellant must both assign and specifically argue any alleged error. See *State v. Deckard, ante*

p. 410, 722 N.W.2d 55 (2006). Because Rodriguez did not argue that this alleged error was prejudicial, we do not consider whether the trial court abused its discretion in retaining the prospective jurors.

### 3. THE TRIAL COURT DID NOT ERR IN FAILING TO GRANT RODRIGUEZ' MOTION FOR CHANGE OF VENUE

Because of extensive pretrial coverage, Rodriguez contends that the district court erred in not granting his motion for a change of venue. Rodriguez also argues that the number of prospective jurors who responded negatively to the questionnaires and at voir dire shows that he could not receive a fair trial in Madison County.

Regarding a change of venue, Neb. Rev. Stat. § 29-1301 (Reissue 1995) provides: "All criminal cases shall be tried in the county where the offense was committed . . . unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein." A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion. *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001). A trial court abuses its discretion in denying a motion to change venue when a defendant establishes that local conditions and pretrial publicity make it impossible to secure a fair and impartial jury. *State v. Strohl*, 255 Neb. 918, 587 N.W.2d 675 (1999).

But mere jury exposure to news accounts of a crime does not presumptively deprive a criminal defendant of due process. Instead, to warrant a change of venue, a defendant must show the existence of pervasive misleading pretrial publicity. A court must evaluate several factors in determining whether the defendant has met the burden of showing that pretrial publicity has made it impossible to secure a fair trial and impartial jury. These factors include (1) the nature of the publicity, (2) the degree to which the publicity has circulated throughout the community, (3) the degree to which venue could be changed, (4) the length of time between the dissemination of the publicity complained of and the date of the trial, (5) the care exercised and ease encountered in the selection of the jury, (6) the number of challenges exercised during voir dire, (7) the severity of the offenses charged, and (8) the size of the area from which

the venire was drawn. *Strohl, supra.* Accord, *State v. Jacob,* 253 Neb. 950, 574 N.W.2d 117 (1998); *State v. McHenry,* 247 Neb. 167, 525 N.W.2d 620 (1995); *State v. Phelps,* 241 Neb. 707, 490 N.W.2d 676 (1992).

In *Phelps,* the trial court denied the defendant's motion to change venue. We noted that there was extensive publicity, locally and nationally, covering the crime. In addition, the defendant introduced affidavits of Madison County citizens stating that they would be unable to give the defendant a fair trial. We, however, determined that voir dire examination provides the best opportunity to determine whether a court should change venue. *Id.* The district court was able to select a jury, with each juror swearing that he or she could fairly try the case. We found no error in denying the request to change venue. *Id.* Similarly, in *Jacob, supra,* the defendant argued that numerous newspaper articles and radio and television broadcasts made a fair trial impossible. The defendant conceded that the news accounts were " 'accurate as far as they went' " but claimed that they also portrayed him negatively and were misleading by omitting certain information. *Jacob,* 253 Neb. at 960, 574 N.W.2d at 130. But after individual and extensive voir dire, an impartial jury was selected. The trial court overruled the defendant's motion for change of venue, and we affirmed.

Rodriguez, however, argues that *Irvin v. Dowd,* 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), supports his contention that the pretrial publicity prejudiced him. In *Irvin,* the U.S. Supreme Court found a " 'pattern of deep and bitter prejudice' " that denied the defendant a fair trial. 366 U.S. at 727. There, the media reported extensively on the defendant's criminal history, announced that he had confessed to the murders, portrayed him as "remorseless and without conscience," and took public opinion polls as to his guilt and what his punishment should be. 366 U.S. at 726. Out of a panel of 430 venirepersons, the court excused 268—nearly two-thirds—for cause because they held fixed opinions of guilt. *Id.*

Here, although the media coverage of these killings was extensive, we find no indication that it was misleading. While the record contains numerous newspaper articles and radio and television broadcasts covering the crimes, the stories were generally

factual. See *State v. Strohl*, 255 Neb. 918, 587 N.W.2d 675 (1999). And Rodriguez does not contend that they displayed any hostility or animosity toward him. See *Irvin, supra*. In addition, many of the articles Rodriguez points to as prejudicial relate only peripherally to his case—covering Nebraska's death penalty or the cost of the murder trials—and some do not even mention his name. The coverage does not rise to the level of that in *Irvin*.

 Moreover, the district court, after conducting voir dire, was able to seat an impartial jury. While the jurors did acknowledge exposure to the media, the law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impression or opinions and render a verdict based upon the evidence. *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 696 (1992). Accord *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990). Seventy percent of the prospective jurors interviewed testified they could give Rodriguez a fair trial, and all 12 jurors stated they could do so. Cf. *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987). The trial court did not abuse its discretion in denying the change of venue.

### 4. THE TRIAL COURT PROPERLY ADMITTED RODRIGUEZ' STATEMENT

On September 27, 2002, after police arrested Rodriguez, he requested to speak with an officer; Det. Donnie Thorson was assigned to interview him. Rodriguez immediately made several statements to Thorson, without having his *Miranda* rights entirely read, and then requested that Thorson leave. A partial and incomplete transcript of the interview reveals the following exchange occurred before Rodriguez' request:

[Thorson (T):] Since sitting in hand cuffs, have to read you rights.

[Rodriguez (R):] I only turned myself in because I don't need that shit right now. I saw my girl on television. Fucked up. You put her on television.

T: Just found that out[.]

R: Came down because. . .

T: Don't think you did it[.]

R: Have a baby girl. Trying to get information. . .

T: . . . if you never did anything wrong. . .

R: Why did you put me on television?

T: I didn't know. I didn't agree with [the] thing that took place . . .

R: [Crying] I didn't know my little brother was capable of doing that shit man. I went in because my girl and shit she'd say the same thing. Asking for a fucking savings account because she owned [sic] money; 100 or something. If I switched it to my name, she wouldn't have to pay for the savings account so she wouldn't have to pay the money.

Before trial, Rodriguez moved to suppress the interview. The district court sustained the motion regarding everything that Rodriguez said after he told Thorson to leave. But the court found that before Rodriguez told Thorson to leave, his statements were voluntary. At trial, the court allowed Thorson to testify regarding the conversation that took place before Rodriguez' request.

Rodriguez' girl friend's testimony contradicted the statement he made regarding why he was at the bank on the morning of the murders. Rodriguez argues that this statement should have been suppressed because Thorson engaged him in a conversation meant to solicit information without reading him *Miranda* warnings.

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. See, *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006); *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003). Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement officers after one has been taken into custody or is otherwise deprived of one's freedom of action in any significant way. *Ball, supra.* This court has determined that interrogation occurs when a person is placed under a compulsion to speak. *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983). " '[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part

of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *State v. Buckman*, 259 Neb. 924, 935, 613 N.W.2d 463, 474 (2000), quoting *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Statements made in a conversation initiated by the accused or spontaneously volunteered by the accused are not the result of interrogation and are admissible. Further, we have excluded from the definition of interrogation a course of inquiry related and responsive to a volunteered remark. *Buckman, supra.* See, also, *Lamb, supra.* In determining whether the State has shown the admissibility of custodial statements by the requisite degree of proof, we will accept the factual determination and credibility choices made by the trial judge unless they are clearly erroneous and, in so doing, will look to the totality of the circumstances. *Ball, supra.*

In *State v. Red Feather*, 205 Neb. 734, 289 N.W.2d 768 (1980), we addressed whether a conversation between an officer and the defendant constituted interrogation. There, an officer placed the defendant under arrest, and the following exchange occurred, according to the officer's testimony:

" 'I said "[to the defendant], you're under arrest." . . . And [the defendant] says, "What for?" And I says, "You're under arrest for raping [the victim]." And he says, "How do you know I did that?" And I says: I got your evidence — I've got evidence. I've got your fingerprints in blood. And he says, "You got me." . . .' "

*Id.* at 738, 289 N.W.2d at 771. Although the defendant did not receive *Miranda* warnings, we determined that he spontaneously volunteered the statement.

Here, Rodriguez was clearly in custody during his interview with Thorson. Police arrested him and placed him in handcuffs, and he was not free to leave the police station. Despite this, the videotape and transcript of the interview do not show that Rodriguez was compelled to speak because of interrogation. Instead, his statements were like the spontaneous comments made by the defendant in *Red Feather, supra.*

Rodriguez' remarks were made in an abrupt, rambling manner and not in response to any questioning by Thorson. When

Thorson attempted to read the *Miranda* warnings, Rodriguez interrupted him by complaining about Rodriguez' and his girl friend's appearances on television. A review of the videotape reveals that Thorson then made several remarks that seemed focused toward calming Rodriguez rather than eliciting information. See *United States v. Voice*, 627 F.2d 138 (8th Cir. 1980). These remarks included telling Rodriguez that he believed him and acknowledging that Rodriguez had to take care of his children.

Further, Rodriguez voluntarily asked, "Why did you put me on television?" Thorson's reply that he "didn't know" and "didn't agree with [the] thing that took place" was merely responsive to Rodriguez' question. But it was then that Rodriguez attempted to explain why he had been in the bank the morning of the murders. Thorson could not have expected that Rodriguez would respond to his remarks by making a potentially incriminating statement. Nothing that Thorson said coerced or compelled Rodriguez to speak.

Rodriguez' statements were spontaneous, excited remarks that were not the result of any compulsion by the police. The trial court did not err in determining that the statements were voluntary and admitting them in evidence.

### 5. THE TRIAL COURT'S ERROR IN EXCLUDING CLAUDIA SOLIS' TESTIMONY WAS HARMLESS

Cortney Barritt, Galindo's girl friend, testified at trial that she knew of the attempted bank robbery before it took place and, more specifically, that she knew Rodriguez was involved. Further, Barritt testified she had told her friend, Claudia Solis, about the planned robbery and had also told her that Rodriguez was involved. Rodriguez attempted to elicit testimony from Solis that Barritt had never mentioned Rodriguez' involvement to her. The record shows the following exchange occurred on redirect examination of Solis:

> [Defense counsel:] [D]id . . . Barritt ever tell you who he [Galindo] was supposed to do a bank robbery with?
> [Solis:] Later, yes. Not after the robberies.
> [Defense counsel:] Who?
> [State:] Objection, it's hearsay. He was here to testify.

THE COURT: Sustained.

[Defense counsel:] Did . . . Barritt ever mention to you that . . . Rodriguez was supposed to —

[Solis:] Never.

[State:] Same objection, and move to strike, and move to strike the answer. I want to approach the bench.

THE COURT: I'll sustain the objection and instruct the jury to disregard the answer that was given.

Rodriguez argues that he intended to impeach Barritt through her prior inconsistent statement to Solis and that the trial court erred in sustaining the hearsay objection. Prior inconsistent statements of a witness are admissible as impeachment evidence. See *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986).

The State contends that because Rodriguez did not make an offer of proof to show what the testimony would have been, he cannot raise the exclusion of the evidence as error. Neb. Rev. Stat. § 27-103(1)(b) (Reissue 1995) provides:

(1) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

. . . .

(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

See, also, *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998). Here, the exclusion of evidence did affect Rodriguez' substantial right because he was prevented from impeaching an adverse witness. Thus, we must consider whether an offer of proof was necessary to preserve the error or if the substance of the evidence was apparent to the court from the context of the question.

In support of its argument that an offer was required, the State refers us to *State v. Navrkal*, 242 Neb. 861, 496 N.W.2d 532 (1993). There, while being questioned about the "nature" of a conversation, one of the defense witnesses testified, " 'Well, she said as far as she knew, it was not a faked burglary.' " *Id.* at 866, 496 N.W.2d at 535. The trial court sustained the prosecution's

hearsay objection. The defendant argued on appeal that the testimony was necessary to impeach another witness. We stated that the trial court was correct in sustaining the hearsay objection and pointed out that the defendant had not made an offer of proof to show that he offered the statement for impeachment purposes. Thus, we held that the defendant could not complain the trial court erred. *Id.*

 We do not find *Navrkal* controlling. Instead, we focus on the alternative in § 27-103(1)(b) which allows an appellate court to find error in an exclusionary ruling when the substance of the evidence was apparent from the context even without an offer of proof.

Was it apparent to the trial judge that Rodriguez' question, "Did . . . Barritt ever mention to you that . . . Rodriguez was supposed to —," and Solis' answer, "Never," were an attempt to impeach Barritt? Although it is a close call, we believe it is apparent from the record that Rodriguez was attempting to impeach Barritt. The substance of Solis' testimony was apparent, because she answered defense counsel's question regarding Barritt's prior inconsistent statement. Compare *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003). In addition, during Barritt's cross-examination, defense counsel laid the foundation for impeachment by asking her, "And if [Solis] said you talked about [Sandoval, Vela, and Galindo's] committing this robbery and no mention of . . . Rodriguez, would she be wrong?" to which Barritt responded, "Yes, she would be." And when asked, "She'd be lying?" Barritt responded, "Yes, because I mentioned [Rodriguez'] name too." We believe it is apparent that Rodriguez was attempting to use Solis' testimony for impeachment, and thus it was not hearsay.

 Obviously, when a trial court excludes evidence, the better trial practice is always to make an offer of proof. See *Sherman County Bank v. Kallhoff*, 205 Neb. 392, 288 N.W.2d 24 (1980). But because it was apparent that Rodriguez was attempting to impeach Barritt, an offer of proof was not required. And because the evidence was not hearsay, we hold that the trial court erred in excluding it.

 The error, however, is not fatal to the State's case because it was harmless. In a jury trial of a criminal case, harmless

error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006). Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id.*

Here, other evidence supported the jury's verdict. The bank's security cameras showed that Rodriguez was in the bank on the morning of September 26, 2002, just before the murders. Galindo testified that Rodriguez had participated in the planning and execution of the robbery. Garvin testified Rodriguez had admitted his involvement after the murders occurred. And Rodriguez' girl friend contradicted his explanation for being at the bank and testified he had lied to her about what he was doing that morning. We conclude that the verdict rendered was surely unattributable to the error.

### 6. THE TRIAL COURT DID NOT ERR IN EXCLUDING TESTIMONY REGARDING THE SPORTING GOODS STORE BURGLARY

Some of the guns used in the murders were taken in a burglary from a local sporting goods store. Galindo initially told an investigator that Barritt had participated in the burglary. But in a later deposition, he recanted and said that Barritt had not participated and that his earlier story was a lie. Rodriguez, however, wished to use Galindo's prior statement to prove that Barritt had participated. Rodriguez' theory was that Barritt, instead of Rodriguez, was the "fourth" person involved in the bank robbery. Rodriguez claims that proving Barritt participated in the burglary would help tie her to the bank robbery by showing her involvement in the "prepa[ra]tory scheme," which in turn would suggest that Rodriguez was not involved. Brief for appellant at 45-46.

In an offer of proof, Rodriguez informed the court that he intended to question Galindo about his current position that Barritt had not participated in the burglary and his prior inconsistent statement that she had. Rodriguez argued this testimony

was admissible to prove that Barritt participated in the burglary. The trial court rejected Rodriguez' gossamer-like connection implicating Barritt as a participant. It overruled the offer of proof as a collateral matter because the sporting goods store burglary was not a crime either charged against or attributed to Rodriguez. The trial court ruled Rodriguez was not entitled to prove whether Barritt participated in the burglary as substantive evidence in his case. Further, the court held that because it was a collateral matter, it would be improper to admit it through testimony of a prior inconsistent statement.

Under Nebraska law, prior inconsistent statements of a witness are not admissible as substantive evidence, unless they are otherwise admissible under the Nebraska Evidence Rules. See, *State v. Williams*, 224 Neb. 114, 396 N.W.2d 114 (1986); *State v. Marco*, 220 Neb. 96, 368 N.W.2d 470 (1985); *State v. Isley*, 195 Neb. 539, 239 N.W.2d 262 (1976). See, also, Neb. Rev. Stat. § 27-801(4)(a)(i) (Reissue 1995). In *Isley*, a defense witness, Mike Slankard, testified that he had not witnessed the crime in which the defendant was charged and that he was not present at the scene. The defense then called Cathy Tucker, who testified that Slankard told her he had been present at the time of the incident. The defense attempted to elicit testimony from Tucker that Slankard had also told her the defendant was not one of the assailants. But this testimony was not contrary to anything Slankard had said in court. Instead, it was "an attempt to offer hearsay proof of substantive facts under the guise of impeachment testimony" and the court excluded the testimony. *Isley*, 195 Neb. at 543, 239 N.W.2d at 265-66.

Here, Rodriguez does not contend that the court should have admitted Galindo's testimony for impeachment. Instead, he argues that the court should have admitted Galindo's testimony about the burglary to show that Barritt participated. He argues that "this evidence was necessary to tie . . . Barritt, Galindo's girlfriend, into the planning and participation in the [bank] job, including the obtaining of weapons." Brief for appellant at 44. Thus, Rodriguez' goal was to use Galindo's prior inconsistent statement as substantive evidence. But the inconsistent statement is not admissible as substantive evidence. The trial court did not err in excluding the testimony.

## 7. Rodriguez' Sentences Were Constitutional

Rodriguez contends that his sentences were unconstitutional and require clarification or resentencing. He argues that after the murders, the Legislature, in a special session, changed the sentence for a Class IA felony from "Life imprisonment" to "Life imprisonment without parole." See 2002 Neb. Laws, L.B. 1, 3d Spec. Sess. (Nov. 22, 2002). See, also, Neb. Rev. Stat. § 28-105(1) (Cum. Supp. 2006). Before trial, Rodriguez filed an amended motion to quash, arguing that L.B. 1 was unconstitutional. The trial court overruled the motion. In May 2004, the trial court sentenced Rodriguez to "life" in a correctional institution for each of the murder counts.

Subsequently, we decided *State v. Conover*, 270 Neb. 446, 703 N.W.2d 898 (2005). In *Conover*, the appellant had been sentenced to two terms of life imprisonment without parole, after L.B. 1 was passed. We held, however, that this amendment to § 28-105(1) was unconstitutional because it was not related to the purpose for which the special session was called. And the previous version of the statute was still in effect. Thus, we held that "at the time of [the appellant's] sentencing, the district court had statutory authority to impose a sentence of life imprisonment on each of the two counts of first degree murder, but it lacked authority to add the phrase 'without parole.' Consequently, the sentences were erroneous but not void." *Conover*, 270 Neb. at 452, 703 N.W.2d at 904. Because we concluded that the appellant's sentences were erroneous, we remanded the cause with directions to resentence the appellant to life imprisonment.

Rodriguez obliquely argues that because resentencing was necessary in *Conover*, it is necessary that the court clarify his sentences as well. Here, however, the district court sentenced Rodriguez to "life" for each count of first degree murder, the statutorily authorized sentence. See *Conover, supra*. The court did not add the phrase "without parole" to the sentences. Unlike in *Conover*, these sentences are valid under the preamendment version of § 28-105(1) and do not require clarification or resentencing. This assignment of error is without merit.

## IV. CONCLUSION

An impartial jury from Madison County convicted Rodriguez of the crimes with which he was charged. Rodriguez' statement

to police regarding why he was in the bank on the morning of the robbery was made voluntarily and was properly admitted. Although the trial court erred in excluding Solis' impeachment testimony, the error was harmless. And Galindo's prior inconsistent statement could not be used as substantive evidence that Barritt participated in the sporting goods store burglary. Finally, Rodriguez' life sentences were constitutional under the valid version of the sentencing statute. Accordingly, we affirm.

AFFIRMED.

HEAVICAN, C.J., not participating.